**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

SONYA WILLIAMS, *individually and as Administratrix of the Estate of* DARRYL TYREE WILLIAMS, *deceased*

Plaintiff,

v.

THE CITY OF RALEIGH, *and* ESTELLA PATTERSON, *in her official capacity as the Chief of Raleigh Police Department*, CHRISTOPHER ROBINSON, *in his individual and official capacity*, JEREMIAH THOMAS, *in his individual and official capacity*, DANIEL AQUINO, *in his individual and official capacity*, JAMES SCOTT, *in his individual and official capacity*, and BRYAN RAMGE, *in his individual and official capacity*,

Defendants.

**COMPLAINT**
**(Jury Trial Demanded)**

NOW COMES the Plaintiff, Sonya Williams, individually and as Administratrix of the Estate of Darryl Tyree Williams, deceased ("Plaintiff" or "Mr. Williams"), by and through undersigned counsel, and brings this Complaint against the Defendants, the City of Raleigh; Estella D. Patterson, Chief of the Raleigh Police Department; and Christopher Robinson, Jeremiah Thomas, Daniel Aquino, James Scott, and Bryan Ramge (collectively, "Defendant Officers"), police officers employed by the Raleigh Police Department (collectively, "Defendants").

## I. NATURE OF THE CASE

1. This action arises out of the tragic and unnecessary death of Darryl Tyree Williams at the hands of Raleigh police officers.

2. On January 17, 2023, in the City of Raleigh, Defendant Police Officers Robinson, Thomas, Scott, Ramge, and Aquino effected an unreasonable seizure of Mr. Williams when they tased him, repeatedly, when he posed no immediate danger to the officers or others, including when he was under the officers' physical control and lacked the ability to evade or take flight from the officers.

3. The officers' mechanism of seizing Mr. Williams was also unreasonable considering his plea, recorded on officers' body cameras, not to continue tasing him because he had a pre-existing heart condition. Shortly after Mr. Williams informed officers of his heart condition, the Defendants tased him again; Mr. Williams fell unconscious, was handcuffed behind his back, then tased again, and shortly thereafter, stopped breathing.

4. The officers' conduct, in addition to violating the Fourth Amendment, amounted to assault and battery, or at least negligence, and it caused the wrongful death of Darryl Tyree Williams

5. The officers' encounter with Mr. Williams was a result of Raleigh PD's controversial practice of "proactive policing."

6. Officers observed Mr. Williams sitting with another man in his parked car in front of an open business and decided to approach them. Mr. Williams was searched, and while no weapon was found on his person, officers discovered what they believed to be the residue of a controlled substance.

7. Williams made a brief but unsuccessful attempt to run and was quickly subdued.

8. Along with Mr. Williams' statement to officers that he suffered from a pre-existing heart condition, these were the facts of which officers were aware when they made the decision to tase Williams six times, three while physically restrained and the last while he was handcuffed,

nonresponsive, and apparently unconscious. Reasonable police officers would have known that these uses of force, which led to Mr. Williams' death, were unreasonable and excessive.

## II. <u>JURISDICTION AND VENUE</u>

9. Plaintiff's case arises under the Constitution and laws of the United States, specifically, the Fourth and Fourteenth Amendments to the United States Constitution.

10. Plaintiff's suit is authorized by 42 U.S.C. § 1983 (allowing suit to address constitutional violations) and 42 U.S.C. § 1988 (providing for attorney's fee and litigation expense awards).

11. This Court has jurisdiction over Plaintiff's federal constitutional claims under 28 U.S.C. §§ 1331 and 1343.

12. This case also arises under the common and statutory law of the State of North Carolina.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

14. One or more of the Defendants reside in Wake County, and all the acts alleged herein occurred within Wake County; therefore, under 28 U.S.C. § 1391, venue is proper in the United States District Court for the Eastern District of North Carolina.

## III. <u>PARTIES</u>

### A. Plaintiff

15. At all times relevant to this action, Darryl Tyree Williams was a resident of the City of Raleigh, Wake County, North Carolina. While located in Raleigh, North Carolina, Mr. Williams died as a result of Defendants' wrongful actions.

16. Plaintiff Sonya Williams ("Plaintiff") was appointed by the Wake County Probate Court as the Administratrix for the Estate of Decedent Darryl Tyree Williams on September 1, 2023.

**B. Defendants**

17. Defendant City of Raleigh is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. It is sued in its capacity as a municipality. The City of Raleigh maintains and operates the Raleigh Police Department ("RPD"). Employees of RPD are employees and agents of the City, which bears legal responsibility under state law for negligent acts and omissions of RPD in the course of their employment. The City is responsible for appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

18. On information and belief, the City of Raleigh has obtained insurance coverage that will indemnify the Defendants from the claims in this case and thereby waives governmental and public officer immunity that each might claim. At the time of the events described herein, the City had waived governmental or sovereign immunity from state law tort claims in this case pursuant to G.S. § 160A-485, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify the City and its agents for any judgment against it or its agents named in this action.

19. Defendant Estella D. Patterson ("Defendant Patterson") is sued in her individual and official capacity as the Chief of Police for the Raleigh Police Department in Raleigh, North Carolina. Upon information and belief, Defendant Patterson is domiciled in North Carolina and is subject to the personal jurisdiction of this Court. Defendant Patterson is the chief law enforcement officer of Raleigh, North Carolina, and, as such, has authority to assign duties to Raleigh police officers. Per Section 6.22 of the City's Charter, Defendant Patterson is charged with the supervision and control

of the police force. Defendant Patterson, acting under the color of law, through her actions and inactions, deprived Darryl Tyree Williams of his constitutional rights and other rights secured by law.

20. Defendant Christopher Robinson ("Defendant Robinson") is sued in his individual and official capacity as a law enforcement officer employed by the Raleigh Police Department located in Raleigh, North Carolina. Upon information and belief, Defendant Robinson is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Robinson was on duty as a law enforcement officer during the arrest and death of Darryl Tyree Williams and, acting under the color of law, deprived Darryl Tyree Williams of his constitutional rights and other rights secured by law.

21. Defendant Jeremiah Thomas ("Defendant Thomas") is sued in his individual and official capacity as a law enforcement officer employed by the Raleigh Police Department located in Raleigh, North Carolina. Upon information and belief, Defendant Thomas is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Thomas was on duty as a law enforcement officer during the arrest and death of Darryl Tyree Williams and, acting under the color of law, deprived Darryl Tyree Williams of his constitutional rights and other rights secured by law.

22. Defendant Daniel Aquino ("Defendant Aquino") is sued in his individual and official capacity as a law enforcement officer employed by the Raleigh Police Department located in Raleigh, North Carolina. Upon information and belief, Defendant Aquino is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Aquino was on duty as a law enforcement officer during the arrest and death of Darryl Tyree Williams and, acting under the

color of law, deprived Darryl Tyree Williams of his constitutional rights and other rights secured by law.

23. Defendant James Scott ("Defendant Scott") is sued in his individual and official capacity as a law enforcement officer employed by the Raleigh Police Department located in Raleigh, North Carolina. Upon information and belief, Defendant Scott is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Scott was on duty as a law enforcement officer during the arrest and death of Darryl Tyree Williams and, acting under the color of law, deprived Darryl Tyree Williams of his constitutional rights and other rights secured by law.

24. Defendant Bryan Ramge ("Defendant Ramge") is sued in his individual and official capacity as a law enforcement officer employed by the Raleigh Police Department located in Raleigh, North Carolina. Upon information and belief, Defendant Ramge is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Ramge was on duty as a law enforcement officer during the arrest and death of Darryl Tyree Williams and, acting under the color of law, deprived Darryl Tyree Williams of his constitutional rights and other rights secured by law.

## IV. STATEMENT OF FACTS

25. At approximately 1:55 a.m. on January 17, 2023, Darryl Tyree Williams was sitting in his car with a passenger in the shared parking lot of Supreme Sweepstakes, Z Food Mart & Check Cashing, and Rock Quarry Smoke Shop & Convenience Store, at 808 Rock Quarry Road in Raleigh, North Carolina. Several other cars were in the parking lot at the time, at least one of which was also occupied.

26. A group of Raleigh police officers, including the Defendant Officers, were in the area conducting "proactive patrols."

27. As part of these patrols, Officers Robinson and Thomas approached Williams' car as it sat parked in the parking lot of an open business.[1] As the officers approached, Williams and another man appeared to be sitting and talking in the vehicle.

28. At the time, Defendant Thomas was being trained by his Field Training Officer, Defendant Robinson.

29. After initially focusing their attention on a red Hyundai sedan parked in the parking lot near the car that was occupied by Mr. Williams and a passenger, Defendant Thomas walked over to Williams' car.

30. Defendant Robinson followed Defendant Thomas over to Mr. Williams' car and shined his flashlight through the passenger side window. The passenger in the car opened the door and began speaking with Defendant Robinson.

31. Defendant Robinson then observed a bottle in the passenger's hand and a small amount of what he believed to be marijuana on the passenger's lap.[2]

32. Defendant Robinson directed both occupants to exit the vehicle and to sit down, while Defendant Aquino told the passenger of the vehicle to turn and face the car.

33. Both occupants of the vehicle asked the officers what was going on and why they were being asked to sit down.

---

[1] Upon information and belief, Officers Robinson and Thomas told SBI investigators that the businesses were closed at the time they approached Mr. Williams and that their purpose for approaching parked vehicles at the business was to "see if they needed assistance." However, dispatch records and bodycam footage indicate that Defendants Robinson and Thomas approached Mr. Williams a few minutes before Z Food Mart & Check Cashing, the business at which Mr. Williams was parked, closed at 2:00 a.m.

[2] So-called "Delta-8" THC products, which cannot be distinguished from illegal marijuana visibly, by smell, or even by chemical analysis at the state crime lab, were legal at the time of this incident pursuant to the 2018 North Carolina farm bill which legalized hemp-derivative products, and they were widely available for lawful purchase throughout the Raleigh area.

34. Defendant Robinson then directed Defendant Aquino to "take the other one," referring to the passenger in Williams' car.

35. Defendants Robinson and Thomas directed Mr. Williams to turn and face the car and place his hands on the car.

36. Mr. Williams complied, and Defendant Robinson performed a frisk of Williams' jacket pockets, waistband, pant legs, and pant pockets.

37. Following the frisk of Mr. Williams' outer clothing, Defendant Robinson began to search Williams' pockets. Williams verbally objected, but Defendant Robinson proceeded with the search.

38. During this search, Robinson discovered a folded-up dollar bill containing remnants of a white powdery substance in Williams' pocket.

39. Defendant Robinson then attempted to handcuff Mr. Williams' and place him under arrest.

40. At this point, Mr. Williams attempted to flee from the four officers present at the scene, Defendants Thomas, Robinson, Aquino, and Scott.

41. Upon information and belief, the passenger of the vehicle, who had first drawn the officers' attention, at this point also ran from the scene on foot, and he was never pursued, arrested, or charged by the Raleigh Police Department.

42. Mr. Williams, however, did not make it far; Defendant Robinson quickly deployed his Taser in drive stun mode and then a second time in probe mode.[3]

43. The Taser made contact with Mr. Williams, who collapsed onto the parking lot.

[3] A Taser—originally an acronym for "Thomas A. Swift's Electric Rifle"—is a conducted energy device manufactured by Taser International, Inc. which fires electricity into human subjects as a means of physically incapacitating them.

44. As Mr. Williams was on the ground, Defendants Aquino and Scott attempted to place handcuffs on him. However, Williams continued in his attempt to flee, managing to run a short distance before officers deployed another Taser in probe mode, which made contact with his body. Mr. Williams fell to the ground.

45. At this point, Defendants Robinson, Thomas, Aquino, Scott, and Ramge subdued and surrounded Mr. Williams, forcefully pinning him to the pavement.

46. Upon information and belief, Defendant Ramge arrived as the other Defendant Officers were pinning Mr. Williams to the ground and assisted the other four officers in subduing and securing Williams.

47. Defendants Ramge, Thomas, Aquino, and Scott laid their bodies on top of Mr. Williams's legs and torso, pinning him down, while Defendant Robinson positioned himself at Williams' head.

48. The officers were able to subdue Mr. Williams within two minutes of Defendant Robinson's initial attempted arrest.

49. At this point, Mr. Williams was pinned to the ground and unarmed; his hands were accounted for, and he could be heard gasping for air.

50. He posed no threat to the safety of the officers or to the safety of anyone in the surrounding community.

51. Mr. Williams was in a prone position, with both of his elbows and forearms resting below his head on the ground, his hands visible and empty.

52. Lying face down but with his head raised, Mr. Williams appeared to have just enough room to draw breath—if only barely.

53. By resting on his elbows and forearms, he was temporarily able to keep the full weight of the four officers, as well as his own body weight, from collapsing onto his chest.




*Williams, moments before his death, in the prone position with both hands visible (face blurred by RPD)*

54. The officers had no reason to believe Mr. Williams might be armed; they knew he was not, because they had conducted a *Terry* frisk of his person, prior to his attempt to flee, and he never left their sight.

55. At no point on the bodycam videos did any officer discuss the prospect of Mr. Williams being armed.

56. As Mr. Williams lay face down in a prone position, with both legs and his torso pinned to the ground and an officer positioned at his head, the Defendant Officers began shouting multiple commands, ordering him to put his hands behind his back.

57. At this point, the officers had a clear visual of both of Mr. Williams' empty hands.

58. Defendant Thomas then tased Mr. Williams against his bare skin in drive stun mode.

59. By this point, Williams had been tased four times.

60. At the time Defendant Thomas administered this Taser application, multiple published cases from the U.S. Court of Appeals for the Fourth Circuit put police officers on notice that it is objectively unreasonable to tase a person under such circumstances. *See, e.g.*, *Armstrong*

*ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 905 (4th Cir. 2016); *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 733–34 (4th Cir. 2013).

61. Defendants Aquino, Scott, and Ramge nevertheless held Mr. Williams down as Defendants Robinson and Thomas tased him.

62. None of the officers made any effort to intervene to protect Mr. Williams or to stop Defendants Robinson or Thomas from tasing him, ignoring their affirmative duty to intervene to protect citizens from the unreasonable use of force by other law enforcement officers.

63. Throughout the encounter, Mr. Williams was in clear distress, at times screaming in agony.

64. After the fourth application of the Taser, he pleaded with officers not to tase him again.

65. He told them that he had pre-existing cardiac issues, stating, "I have heart problems. . . . Please . . . please."



*Officers press their Tasers to Williams' bare skin. A Taser probe hooked in Williams' skin is visible at left.*

66. Bystanders gathered nearby as Mr. Williams begged officers to please stop tasing him.

67. Williams was unarmed, subdued, talking about his heart condition, and pleading with the Defendant Officers to stop. Defendant Robinson responded by verbally counting down from three in quick succession before tasing Mr. Williams a fifth time, in drive stun mode.

68. Defendant Robinson remained calm as he gave this instruction and used the weapon while the other Defendants pinned Mr. Williams to the ground.

69. After the fifth Taser application, Mr. Williams screamed in pain and then fell silent, losing consciousness.

70. The Defendant officers then handcuffed Mr. Williams' hands behind his back while he was unresponsive.

71. After Mr. Williams became unresponsive and after or as he was being secured in handcuffs, Defendant Thomas deployed his Taser yet again in drive stun mode against Mr. Williams' near-lifeless body.

72. The State Bureau of Investigation would later confirm this fact.

73. In total, Mr. Williams was tased six times, four of which were in drive stun mode, at least two of which were directly applied to the skin, and three of which were deployed while Williams was subdued by multiple officers.

74. Shortly thereafter, the Defendant Officers noticed Mr. Williams was unresponsive. Defendant Aquino began to rub Mr. Williams' sternum in an attempt to get him to respond, saying "Hey, boy."

75. At approximately 2:06 a.m., the Defendant Officers requested EMS to expedite their response and began performing CPR on Mr. Williams while his hands were still cuffed behind his back.

76. EMS arrived and continued resuscitation efforts as Mr. Williams was transported to the hospital.

77. Mr. Williams arrived at the hospital at 2:59 a.m.

78. His initial diagnosis upon being admitted to the hospital was cardiac arrest and Taser injury. Upon information and belief, Williams was pulseless and unresponsive for more than 45 minutes prior to his arrival at the Emergency Department.

79. Hospital staff pronounced Williams dead at 3:01 a.m. His final diagnosis was listed as electrocution and cardiac arrest.

80. The autopsy classified Mr. Williams' death as a homicide and listed the cause of death as cardiac arrest in the setting of cocaine intoxication, physical exertion, conducted energy weapon use, and physical restraint.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Use of Excessive Force in Violation of the Fourth Amendment**
**42 U.S.C. § 1983**
***Against Defendants Christopher Robinson and Jeremiah Thomas***

81. All preceding paragraphs are incorporated as if fully set out herein.

82. Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the right to be free from excessive force under the Fourth Amendment to the U.S. Constitution, which applies to the actions of local governments pursuant to the Fourteenth Amendment.

83. The actions of Defendants Thomas and Robinson to deploy a taser when any alleged crime being investigated was nonviolent, when officers were aware that Williams had no weapons and posed no immediate danger, and when any resistance he might have offered was passive, amounted to excessive force, caused Williams' death, and violated the Fourth Amendment.

84. For decades, the Supreme Court of the United States has interpreted the Fourth Amendment to prohibit a police officer's use of deadly force to effect the arrest of an unarmed fleeing person who poses no immediate threat to officers or other people. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

85. The U.S. Court of Appeals for the Fourth Circuit has interpreted the Fourth Amendment to proscribe the use of a Taser against an unarmed person who has been brought to the ground and restrained physically by several officers and who does not pose an immediate threat to officers or others, even if the individual is non-violently resisting being handcuffed. *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 905 (4th Cir. 2016); *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 733–34 (4th Cir. 2013).

86. The Fourth Amendment requires police officers to have a reasonable justification for each individual shock of a Taser. *See, e.g., Meyers*, 713 F.3d at 733 ("[The] conclusion that Officer Mee's first three uses of the taser were objectively reasonable does not resolve our inquiry into the reasonableness of the seven additional taser shocks that he administered, because 'force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.'" (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)).

87. Even assuming Williams was passively resisting in failing to put his hands behind his back, while being pinned to the ground by five officers, this was not conduct presenting "an objective threat to safety" that would entitle officers to use the extreme force of Taser deployment. *Armstrong*, 810 F.3d at 905.

88. The Defendant Officers' use of force violated the Fourth Amendment even if Mr. Williams did not have a heart condition or had not informed police about it: In North Carolina, a police officer "may *only*" use a Taser when the circumstances present a risk of immediate danger that could be mitigated by the Taser, and "physical resistance is not synonymous with risk of immediate danger." *Id.* (emphasis in original).

89. The fact that Mr. Williams informed the Defendant Officers that he had a pre-existing heart condition, however, rendered the Defendant Officers' decision to use a Taser against him even more unreasonable than it already was under a totality of the circumstances analysis. As one federal court explained:

> [T]he logical deduction . . . is that an individual with a heart condition is at greater risk for injury from a taser than an individual without a heart condition. . . . [W]hen an individual is tased, it is a stressful situation that could lead to an elevated heart rate, elevated blood pressure, and increased respiration. This makes sense considering the at-a-minimum five-second incapacitation and severe pain caused by the taser's electrical impulses. Subjecting an individual with an undefined heart condition to these elevated vital signs—which may already be elevated because of the stressful nature of the situation prior to the taser use or because of the individual's recent exertive activity, such as jogging—would seem to pose a particular risk of triggering that individual's heart condition. . . . The absence of evidence quantifying the risk of such secondary injuries does not preclude the Court from considering [a plaintiff's statement to police that they have a] heart-condition . . . in analyzing the totality of the circumstances[.]

*Hesterberg v. United States*, 71 F. Supp. 3d 1018, 1036 (N.D. Cal. 2014) (cleaned up).

90. Even in the absence of Mr. Williams' statement about his heart condition, the officers' six applications of the Taser, as depicted on their body camera videos, was objectively unreasonable and violated the Fourth Amendment. *See, e.g.*, *Armstrong*, 810 F.3d at 905 ("[T]aser use is unreasonable force in response to resistance that does not raise a risk of immediate danger[.]"); *see also Meyers*, 713 F.3d at 733–34 ("It is an excessive and unreasonable use of force for a police

officer repeatedly to administer electrical shocks with a Taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest.”).

91. Mr. Williams was known to be unarmed and was nevertheless repeatedly electrocuted and subjected to deadly force. The U.S. Court of Appeals for the Fourth Circuit has held that officers may not use deadly force even against a person who is known to have a weapon and who has used it against an officer, if the person’s hands are accounted for, they are outnumbered by officers five-to-one, and are pinned to the ground. *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 669 (4th Cir. 2020).

92. In this case, the Raleigh Police Department’s disregard for clearly-established Fourth Circuit law, as evidenced by the failure of five of its police officers to recognize the wrongfulness of Tasing a person while he was restrained by five police officers, resulted in the unnecessary and wrongful death of a human being, Darryl Tyree Williams

93. While acting under color of state law, Defendants Robinson and Thomas deprived Mr. Williams of his clearly-established right to be free from excessive force by tasing him in circumstances in which it was objectively unreasonable to employ such a high degree of force.

94. When Defendant Robinson deployed his Taser three separate times as Mr. Williams was fleeing, he was aware that Mr. Williams was unarmed and presented no risk of immediate danger to either officers or the surrounding community.

95. At the time the fourth, fifth, and sixth Taser applications were applied, Mr. Williams was subdued by multiple officers and posed no immediate danger either to the officers or anyone else.

96. At all times relevant to this action, Mr. Williams had a clearly-established constitutional right not to be subjected to excessive force while being arrested, even if his arrest was otherwise proper.

97. Defendant Thomas used excessive force, in violation of the Fourth Amendment, when he tased Mr. Williams in drive stun mode while Mr. Williams was unarmed, secured by at least four officers, and was in a prone position posing no threat to anyone.

98. Defendant Thomas used excessive force, in violation of the Fourth Amendment, when he deployed his Taser in drive stun mode while Mr. Williams was handcuffed and unconscious, and despite Mr. Williams having just moments before communicated to him that he had a heart condition.

99. Defendant Robinson used excessive force when he deployed his Taser in drive stun mode on Mr. Williams' left upper back, crossing vectors with his heart, after Williams was subdued by four officers, in the prone position, posing no immediate threat of danger to any officer or surrounding individuals, and seconds after Mr. Williams told the officers that he had a heart condition and begged for his life.

100. As a direct and proximate result of Defendants Robinson's and Thomas' actions, Mr. Williams suffered cardiac arrest and died.

## SECOND CLAIM FOR RELIEF

**Use of Excessive Force and Failure to Intervene in Violation of the Fourth Amendment**

**42 U.S.C. § 1983**

***Against Defendants Daniel Aquino, James Scott, and Bryan Ramge***

101. All preceding paragraphs are incorporated as if fully re-written herein.

102. Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the right to be free from excessive force under the Fourth Amendment to the U.S. Constitution, which applies to the actions of local governments pursuant to the Fourteenth Amendment.

103. While acting under color of state law, Defendants Aquino, Scott, and Ramge deprived Mr. Williams of his right to be free from excessive force.

104. At all times relevant to this action, Mr. Williams had the clearly-established constitutional right not to be subjected to excessive force while being arrested, even if his arrest was otherwise proper.

105. Defendants Aquino, Scott, and Ramge participated in the arrest of Mr. Williams and physically subdued him during the final three Taser deployments, which were administered while he was in the prone position, posing no immediate threat of danger to anyone, and after Mr. Williams had informed officers that he had a heart condition.

106. As set forth in the First Claim for Relief, Defendants Robinson and Thomas engaged in excessive force by tasing Mr. Williams multiple times in violation of his Fourth Amendment rights.

107. Defendants Aquino, Scott, and Ramge had a reasonable opportunity to prevent the excessive use of force and a duty to intervene. *See, e.g.*, *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) (stating that "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act").

108. Rather than helping Mr. Williams, pursuant to their duty to intervene, Defendants Aquino, Scott, and Ramge restrained him while Robinson and Thomas tased him until he died.

109. Mr. Williams' told the Defendant officers that he had a heart condition.

110. The Defendant officers were thus put on notice of a potentially lethal scenario.

111. The Defendant officers had a reasonable opportunity to intervene and prevent Mr. Williams' death, but they did not.

112. As a direct and proximate result of Defendants Aquino's, Scott's, and Ramge's actions and inactions, Mr. Williams suffered cardiac arrest and died.

**THIRD CLAIM FOR RELIEF**
**Excessive Force (Municipal Liability pursuant to *Monell*)**
**42 U.S.C. § 1983**
***Against Defendant Chief of Police Estella Patterson and Defendant City of Raleigh***

113. All preceding paragraphs are incorporated as if fully re-written herein.

114. This claim is brought pursuant to 42 U.S.C. § 1983.

115. Defendant City of Raleigh maintains an armed police force, the Raleigh Police Department, with the power to arrest citizens.

116. Defendant Patterson, as Chief of Police, promulgates policies regulating the conduct of officers under her command.

117. Defendant Patterson is also ultimately responsible for the assignment of personnel for training purposes.

118. Under a *Monell* theory of liability, a municipality may be held liable for an officer's actions when a plaintiff establishes that the officer violated their constitutional right, and where the violation resulted from either official policy, unofficial departmental custom, or because the municipality was deliberately indifferent in failing to train or supervise the officer. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

119. Defendants City of Raleigh and Patterson are liable under *Monell* for several reasons: First, the department's decision- and policy-making with respect to the deployment of Tasers, and training officers about their use, is so inadequate in view of the potential dangers associated with the device as to show RPD's deliberate indifference to the wellbeing of people subjected to their use.

120. Additionally, a series of fatal police encounters in the decade prior to Mr. Williams' death, as well as with the City's settlement of recent civil rights lawsuits involving allegations of excessive force, indicate that Defendants City and Patterson are aware of officers' custom and practice of using excessive force, of the inadequacy of the department's training protocols and training personnel, and of the dangers these inadequacies pose to the constitutional rights of people in Raleigh.

121. In this case, Defendant Robinson's designation as a "training officer"—someone entrusted to teach Defendant Thomas about appropriate decision-making regarding the use of force in the field—was unreasonable and is itself evidence of the department's deficient training practices. *See, e.g.*, *City of Canton*, 489 U.S. at 391 (holding *Monell* liability may attach if "the identified deficiency in a city's training program [is] . . . closely related to the ultimate injury").

122. At the time of Williams' death, Defendant Robinson had been involved in a serious use-of-force incident less than a month before, one that resulted in significant facial and dental injuries to—and the hospitalization of—20-year-old Thomas Ray Sanders, Jr. According to a civil claim Sanders named against Robinson and Raleigh PD, Robinson "abruptly slammed [Sanders] face first" into the ground during an encounter on December 19, 2022. The officer did this in order to seize Sanders' cell phone after he noticed Sanders had filmed him knocking and pinning Sanders' teenage cousin to the ground, and driving his elbow and knee into his head and neck, after the teen refused to provide the officer with his name. Robinson had approached the men to demand they identify themselves after he received a call that they were late to check out of a nearby motel. The encounter occurred after they had left the property. Following the incident, Robinson charged Sanders' teenage cousin with resisting and assault offenses that were dismissed by the District Attorney following a review of the video evidence.

123. Records also indicate that, prior to the incident with Mr. Williams, Defendant Robinson, a relatively new officer himself, received eight hours of Taser training—the same as Defendant Thomas.

124. Under *Canton*, liability may attach to a municipality if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

125. The above-mentioned circumstances show "the need for more or different training," as the *Canton* Court put it.

126. Defendant Robinson failed to model an appropriate use of force for his trainee by using his Taser unlawfully, and he exercised poor supervision in permitting Defendant Thomas to also use his Taser with excessive force by tasing a handcuffed and unconscious man.

127. Officers' subjective intentions are not relevant to a court's determination of whether they used excessive force. *Kentucky v. King*, 563 U.S. 452, 464 (2011). Only an officer's objective conduct is relevant.

128. The policy that Defendants City and Patterson adopted concerning the use of Tasers is self-contradictory and does not provide RPD officers with clear guidelines as to the weapons' appropriate use.

129. At its outset, the policy provides: "The use of . . . conducted energy weapons by authorized and trained personnel is acceptable when force is necessary to incapacitate or control an individual."

130. Stated differently, Raleigh officers are instructed that they may use Tasers if they determine "force is necessary to . . . control an individual."[4]

131. As the circumstances of this case indicate, this malleable and confusing standard invites violations of civil rights law, which requires that force used not be grossly disproportionate to the threat posed. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that officers' authority in employing physical force depends on the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether they are actively resisting arrest or attempting to evade arrest by flight).

132. A standard that permits officers to employ Tasers simply to "control" people violates the Fourth Amendment. *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 904 (4th Cir. 2016). Such a policy not only is likely to result in the violation of constitutional rights; it is likely to result in unnecessary injury or death.

133. On April 10, 2013, Raleigh officer M.A. Ford deployed a Taser against an unarmed naked man, Jeffrey Thomas Sadler, who was known to the department to have a history of mental illness, causing his death. Although it remained unknown to the public for years, the department, in a 2021 pleading in unrelated litigation, "admitted" that Officer Ford had Tased Saddler *eleven* times prior to his death. The department also admitted that Ford's actions had been investigated internally and determined to be consistent with department policy. *See generally* Answer to First Amended

---

[4] The policy language appears to authorize one of the most serious uses of force—the use of "less lethal weapons"—whenever any use of force is deemed appropriate. Additional language, found further down in the policy, purports to limit the use of Tasers to situations where "it is necessary to incapacitate or gain compliance from a person who is actively resisting, exhibiting active aggression, or to prevent individuals from harming others or seriously injuring themselves." Some of this language hews closer to cases like *Armstrong* and *Meyers*, which reject the use of Tasers as a simple means of control. However, the policy's disjunctive use of the phrase "or gain compliance" appears to authorize the use of a Taser simply as a mechanism of control.

Complaint, *Estate of Mojarrad v. Edwards, et al.*, 5:20-cv-00396-FL, at 16–17 (E.D.N.C. May 3, 2021).

134. Even one application of a policy may establish *Monell* liability if the policy, by its terms, is incompatible with a prior court decision. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985).

135. Upon information and belief, the department's policy has contributed to numerous instances of excessive force through the unlawful use of Tasers to "control" people across the City of Raleigh, causing unnecessary death, injury, and suffering.

136. Defendants Patterson and the City of Raleigh are custodians of records reflecting such uses of force and are aware of this pattern and practice.

137. This pattern and practice with respect to the misuse of Tasers is part of a larger pattern of excessive force and deadly force that has been pervasive within the Raleigh Police Department in recent years and under Defendant Patterson's supervision.

138. Over the past two years, the city has paid well in excess of a million dollars to resolve cases involving allegations of excessive force that have been brought against the department and its officers. These include, but are not limited to, the following:

a. In one case, a Raleigh Sergeant, William S. Rolfe, testified "there are hundreds of policies that are on paper that are supposed to be followed as a practice and are not." Rolfe Deposition at 64, *Irving, et al. v. City of Raleigh, et al.*, No. 5:22-cv-0068-BO (E.D.N.C. 2023). Rolfe described rule breaking in the department as "extremely common" and "the status quo"; and he said, as a supervisor, he believed it was his duty to "have [his officers'] back, even when they're wrong." *Id.* at 109, 147–49; *see generally* Sean Campbell, *Reign of Terror in Raleigh*, ROLLING STONE, at 26 (May 2023). Officers' violation of the rules at issue in *Irving* resulted in the unwarranted use of force to gain entry into two homes without lawful justification.

b. In another case, the department reached a settlement with a teenage girl who alleged a different Raleigh Sergeant, Brian Scioli, used excessive force against her and then retaliated against her for complaining about it by directing her wrongful arrest. Four years earlier, Scioli was recorded on camera telling a different teenager, "I'll assault you all I

want. I'm allowed to threaten people; I'm police." Jasmine Gallup, *Two Years After Protests, Activists See Little Progress on Raleigh Police Reform*, INDY WEEK (June 1, 2022). Neither incident dissuaded the department from permitting Scioli to hold a position of leadership over other officers in the department.

c. In another case, the department settled excessive force claims brought by the estate of Soheil Mojarrad, relating to his fatal shooting by Raleigh police officer William Edward. Notice of Settlement, *Est. of Mojarrad v. Edwards*, No. 5:20-cv-00396-FL (E.D.N.C. June 10, 2023). Mojarrad's estate alleged that Edwards received "improper training on the appropriate use of force and use of deadly force" and the department maintained "policies and customs . . . that permitted rampant unaccountability for officers in use of force scenarios, as well as an inappropriate policy and inadequate training regarding the use of deadly force." Complaint, *Mojarrad*, at 2.

d. In another case, upon information and belief, the department settled excessive force claims brought by a pair of young children who alleged that officers pointed firearms at them without lawful cause or justification as they sat in the backseat of their father's car.

139. The department's repeated elevation of people to positions of leadership who are willing to disregard policies put in place for the protection of the public's civil rights is corroborative of the notion that the Plaintiff's injuries are traceable to municipal defendants' custom of permitting excessive force, and it is evidence that the City and Chief Patterson have acted with deliberate indifference in failing to properly train and supervise their officers.

140. The department's toleration of and failure to discipline officers who engage in excessive force, even when their force results in the city paying monetary civil rights settlements, is evidence that Plaintiff's injuries are traceable to municipal Defendants' custom of permitting excessive force, and it is evidence that they have acted with deliberate indifference in failing to supervise their officers. *See, e.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (stating that "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law").

141. In the months prior to Mr. Williams' death, Raleigh police officers were involved in multiple fatal Taser and use-of-force incidents that were caught on video and which evinced the need for better training:

a. On January 11, 2022, officers tased Daniel Turcios in the back as he walked away from the scene of a car accident that left him concussed, then shot him when he rose back to his feet. After the incident, the department's spokesman told news outlets Turcios was intoxicated and a danger to others because he had a pocketknife. Subsequent toxicology reports, however, showed only nicotine and caffeine in Turcios' system.

b. Two months later, officers fired 30 rounds at Rafael Rodriguez-Nunez, who was in the throes of a mental health crisis when he appeared in the parking lot of an RPD substation and began throwing small cups of flammable liquid at unoccupied police cars. When officers responded, Rodriguez-Nunez invited them to kill him, saying, "Today is my day to move on." Rather than attempt to de-escalate the situation, a Raleigh police officer, standing a safe distance away, responded, "Go ahead. Go ahead, motherfucker! Do it!" When Rodriguez-Nunez threw another cup, officers shot and killed him.

142. So many fatal and non-fatal uses of force by the Raleigh Police Department have occurred during Chief Patterson's tenure that the U.S. Assistant Attorney General for Civil Rights and members of her staff met last year with Triangle-area civil rights lawyers for further fact-finding.

143. In this case, the Raleigh Police Department's culture of violence and disregard for clearly-established Fourth Circuit law resulted in the unnecessary and wrongful death of a human being, Darryl Tyree Williams.

144. Defendant Patterson is the department's principal policymaker. She has authority over all the Defendant Officers and the responsibility to ensure they receive adequate training. She is aware of the problems that persist in her department and of the aforementioned incidents, policies, and lawsuits.

145. The City and Chief Patterson have failed to act to address RPD officers' pattern and practice of deploying Tasers inappropriately and, more generally, to interrupt the department's pattern and practice of engaging in excessive force.

146. The City and Chief Patterson have failed to properly supervise and discipline officers, despite being aware that officers are deliberately indifferent to internal policies and that there is a pattern, practice, and culture within RPD of officers violating policies that are designed to ensure they comply with the law.

147. Mr. Williams' death is the culmination of RPD's practice of treating the rule of law as it pertains to Tasers, and as set forth in cases like *Armstrong* and *Meyers*, as a suggestion. Prior to these cases, the law gave officers more discretion to employ Tasers as a pain compliance technique, and officers in many departments grew accustomed to using them this way. However, nearly 500 deaths have been connected to the device over the past decade, and courts have responded by recognizing constitutional limits to that discretion.

148. Today, the law prohibits officers from employing a Taser against a person who has been effectively restrained by officers, as well as from using them against fleeing persons who are unarmed, suspected of nonviolent offense, and who pose no immediate threat to anyone.

149. Individually and collectively, the aforementioned facts, lawsuits, incidents, and staffing and training decisions support the conclusion that the Raleigh Police Department has a policy, practice, or custom of violating the rights of people through the use of excessive force.

150. Because of Defendants' policy, practice, or custom, Plaintiff's only son lost his life, and the Plaintiff suffered damages, including pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to her self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, and injury to her dignity.

## FOURTH CLAIM FOR RELIEF

**Assault and Battery and Negligence**

***Against Defendants Christopher Robinson and Jeremiah Thomas***

151. All preceding paragraphs are incorporated as if fully re-written herein.

152. At all times relevant to this Complaint, Defendants Robinson and Thomas were acting in their official capacity as employees and agents of the Raleigh Police Department and within the course and scope of their employment with the agency.

153. Defendants Thomas and Robinson threatened to use force and inflict imminent bodily injury upon Darryl Tyree Williams by and through their use and intentional display of Tasers.

154. Defendants Thomas and Robinson's display and use of Tasers caused Darryl Tyree Williams to have a reasonable apprehension that harmful and offensive contact with his person was imminent.

155. Defendants Thomas and Robinson intentionally deployed their Tasers multiple times at Darryl Tyree Williams, and therefore caused him bodily injury, physical pain, and death.

156. Defendants Thomas' and Robinson's intentional actions, as alleged above, were done without the consent of Darryl Tyree Williams and without lawful justification or excuse.

157. Defendants Thomas and Robinson assaulted and battered Darryl Tyree Williams, thereby killing Mr. Williams.

158. In the alternative, Defendants Thomas and Robinson intentionally pointed their Tasers at Darryl Tyree Williams, without lawful justification and excuse and in violation of North Carolina General Statute § 14-32, and negligently discharged their Tasers at Darryl Tyree Williams, thereby killing him.

159. The actions of Defendants Thomas and Robinson, as alleged in this claim for relief, were committed within the course and scope of their employment and agency with the Raleigh Police Department.

160. Plaintiff is entitled to compensatory damages from Defendants Thomas and Robinson, jointly and severally, in an amount exceeding $10,000.00.

161. The actions of Defendants Thomas and Robinson, as alleged in this claim for relief, were intentional, malicious, willful, wanton, and/or in reckless disregard of the rights of Darryl Tyree Williams.

162. Plaintiff is entitled to punitive damages from Defendants Thomas and Robinson in their individual capacities, in an amount exceeding $10,000.00.

**FIFTH CLAIM FOR RELIEF**
**Wrongful Death**
**N.C.G.S. § 28a-18-2**
***Against All Defendants***

163. All preceding paragraphs are incorporated as if fully re-written herein.

164. Plaintiff is entitled to recover compensatory damages for the wrongful death of Darryl Tyree Williams, as alleged above.

165. At the time of his death, Mr. Williams was survived by his mother, Sonya Williams, who is the sole beneficiary of the Estate of Darryl Tyree Williams

166. At the time of his death, Darryl Tyree Williams was thirty-two (32) years old and reasonably expected to live a full, fruitful, and meaningful life, and to have provided substantial services, protection, and care to the beneficiary of his Estate, as well as security, companionship, guidance, advice, income, and support.

167. As a result of Darryl Tyree Williams's death, the beneficiary of the Estate has been deprived of his income, services, protection, care, and assistance, together with his society, companionship, comfort, guidance, and advice.

168. This action is brought under North Carolina General Statute § 28a-18-2, and the Plaintiff, as the Administratrix of the Estate of Darryl Tyree Williams, is entitled to recover the following damages on behalf of the beneficiary of his Estate for the death by wrongful acts:

a. Expenses for the care, treatment, EMS transportation, and hospitalization incident to the injury resulting in death;

b. Compensation for the pain and suffering of Darryl Tyree Williams;

c. The funeral and burial expenses of Darryl Tyree Williams;

d. The present monetary value of Darryl Tyree Williams for the loss of the reasonably expected:

   i. Net income of Darryl Tyree Williams;

   ii. Services, protection, care and assistance of Darryl Tyree Williams, whether voluntary or obligatory; and

   iii. Society, companionship, comfort, guidance, and advice of Darryl Tyree Williams

169. As a result of the wrongful death of Darryl Tyree Williams which was directly and proximately caused by Defendants' actions as described above, Plaintiff, as Administratrix of the Estate of Darryl Tyree Williams, is entitled to recover compensatory damages from Defendants in an amount exceeding $10,000.00.

170. Plaintiff, as the Administratrix of the Estate of Darryl Tyree Williams, is entitled to recover punitive damages from Defendants Thomas and Robinson, in their individual capacity, in an amount exceeding $10,000.00.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court award relief as follows:

A. That Plaintiff have and recover compensatory damages against all Defendants, jointly and severally, for the violations of constitutional rights, tortious conduct, and wrongful death of Darryl Tyree Williams;

B. That the Plaintiff recover punitive damages in an amount to be determined at trial, for the willful, reckless, and malicious conduct of Defendants;

C. That the Plaintiff be granted equitable relief, such that Defendant City of Raleigh be made to adopt an appropriate policy to prevent future instances of excessive force involving the use of Tasers;

D. That the Plaintiff be awarded attorneys' fees and the costs of this action and other costs that may be associated with this action; and

E. That the Court grant any and all other relief it deems appropriate.

## JURY DEMAND

The Plaintiff respectfully demands a jury trial on all issues of fact that may arise from the pleadings.

Respectfully submitted, this the 18th day of March, 2024.


***/s/ Ian Mance*****_____**
Dawn Blagrove
N.C. Bar No. 36630
Ian A. Mance
N.C. Bar. No. 46589
Jaelyn D. Miller
N.C. Bar No. 56804
EMANCIPATE NC
Post Office Box 309
Durham, North Carolina 27702
Tel: (919) 682-1149
dawn@emancipatenc.org
ian@emancipatenc.org
jaelyn@emancipatenc.org
*Counsel for Plaintiff*

Benjamin Crump*
BEN CRUMP LAW, PLLC
122 South Calhoun Street
Tallahassee, Florida 32301
Tel: (214) 651-4260
Fax: (214) 651-4261
ben@bencrump.com
*Counsel for Plaintiff*

Kenneth P. Abbarno*
Robert F. DiCello*
Joe F. Fouche III*
DICELLO LEVITT LLP

8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
Tel.:  440-953-8888
Fax: 440-953-9138
rfdicello@dicellolevitt.com
kabbarno@dicellolevitt.com
jfouche@dicellolevitt.com
*Counsel for Plaintiff*

*Special Appearance forthcoming